UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT MACIOCE, *on behalf of himself and all others similarly situated*,

                                                    Plaintiff,

                        -v-

HISENSE USA CORPORATION,

                                                    Defendant.

25 Civ. 1608 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to compel arbitration in this putative class action. Plaintiff Robert Macioce brings claims against defendant Hisense USA Corporation ("Hisense"), alleging Hisense falsely represented to him and others that its TVs use certain display-enhancing technology. He brings claims of false and deceptive advertising, including under New York General Business Law ("NYGBL") §§ 349–50. Dkt. 34 ("Amended Complaint" or "AC"). In the instant motion, Hisense argues that Macioce agreed to submit his claims for arbitration at multiple points, including while buying his TV and later while installing it, and that the arbitration clauses bar class actions. Dkts. 42–49.

For the foregoing reasons, the Court grants Hisense's motion to compel arbitration.

## I.      Background[1]

### A.      The Parties

Macioce is a resident and citizen of New York. AC ¶ 9.

---

[1] In considering a motion to compel arbitration, a court reviews all relevant, admissible evidence submitted by the parties, including affidavits, answers to interrogatories, and pleadings. *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 49–50 (2d Cir. 2022). A court may consider unrebutted declarations, and where the material facts as to the formation of an arbitration agreement are

Hisense manufactures TVs and other consumer electronic products, which it sells through a combination of brick-and-mortar retailers and online retailers, such as Amazon, Best Buy, and Target. *Id*. ¶¶ 10, 14–15, 17, 48. It also sells its TVs directly to consumers through Hisense-usa.com. *Id*. ¶ 47. Hisense's principal place of business is in Suwanee, Georgia. *Id.* ¶ 10.

**B.      Underlying Events**

**1.      Macioce's Decision to Buy the TV**

In November 2024, Macioce was searching for a new TV and saw one manufactured by Hisense. Hisense advertises its TVs as using "QLED," or quantum light-emitting diode technology. *Id*. at 12.[2] In a QLED TV, light filters through a thin sheet with nanoparticle-sized dots, which sits on the TV's surface and absorbs certain colors. *Id*. ¶¶ 26–28. This targeted absorption enables a QLED TV to emit a wide range of colors. *Id*. ¶ 29. Hisense describes its

---

undisputed, resolve a motion to compel arbitration on the papers, as a matter of law. *See id*.; *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).

Here, the Court considered the parties' pleadings: the AC, Hisense's motion to compel arbitration, Dkt. 49, Macioce's opposition, Dkt. 51, and Hisense's reply in support, Dkt. 55. The Court also considered the parties' evidentiary submissions. These included: (1) Macioce's responses to interrogatories, Dkt. 43-1 ("Resp. to RFAs"); (2) an affidavit from a Hisense engineer, Dkts. 44–45 ("Zhang Decl."), including a photograph of Macioce's TV taken during a consensual examination, Dkt. 45-3 ("Photograph of Macioce TV"); (3) an affidavit from a Best Buy vice president, Dkt. 46 ("Mattox Decl."); (4) the BestBuy.com terms and conditions, Dkt. 46-2 ("Best Buy Terms" or "Terms"); (5) an affidavit from a Best Buy digital commerce product team head, Dkt. 47 ("Olson Decl."); and (6) an affidavit from a Best Buy associate director of membership engagement, Dkt. 48 ("Poplau Decl."), attaching a copy of the terms and conditions of Best Buy's loyalty program, Dkt. 48-6 ("Loyalty Terms"). In considering the limited disputes of fact, the Court has drawn all reasonable inferences in favor of the non-moving party (here, Macioce). *Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 229 (2d Cir. 2016).

[2] In general, a TV displays an image through a combination of liquid-crystal display ("LCD") and light-emitting diode ("LED") technology. AC ¶¶ 20–23. A TV screen is divided into millions of small sections, or pixels. *Id*. ¶ 23. To produce an image, each pixel of the LCD is commanded to turn on or off, permitting light to filter through to the screen. *Id*. In tandem, LEDs emit different colors at different levels of brightness. *Id*. ¶ 21. The process by which the LCD permits the colors to filter through results in images appearing on a TV screen. *Id*. ¶ 22.

QLED TVs as capable of rendering "a billion individual shades" of color.  *Id*. at 14.  It touts the technology as enabling the viewer to "see color like you've never seen it before," including "the exact hues of every blade of grass on the field and every line on the court."  *Id.* at 15.  Salient here, Hisense described the 2024 model of its QD5 TVs as using QLED technology: "The Hisense QD5 series includes QLED Quantum Dot Color to dramatically increase the color space and improve overall color saturation for everything you watch."  *Id.* ¶ 61 (quoting *From the Manufacturer*, BEST BUY (2025)).

In searching for a new TV, Macioce represents, he "compared the television to other QLED or QD televisions at similar price points."  *Id.* ¶ 64.  Before buying the TV, he researched the "technical and display specifications of the television, and related advertising."  Dkt. 51 ("Opp'n") at 5.

### 2.    Macioce's Purchase of the TV from Best Buy

On November 23, 2024, Macioce purchased a 43-inch QD5 Hisense TV (the "TV") using his Best Buy "mobile app[lication]."[3]  Dkt. 47 ("Olson Decl.") ¶ 5.

Through declarations and supporting documentation, Hisense represents—without refutation—that, while purchasing the TV via the Best Buy app, Macioce necessarily assented to the BestBuy.com Terms & Conditions ("Best Buy Terms" or "Terms").  *Id.* ¶ 7.  A declaration from the head of Best Buy's digital commerce product team explains that, as of November 23, 2024, its mobile app displayed a yellow button stating, "Place your order," which a user such as Macioce would have to click to complete a purchase.  *Id.* ¶¶ 7–8.  A user would be unable to complete a purchase via the application without clicking on the yellow "Place your order"

---

[3] Macioce states that he used his credit card to purchase the TV (and that his son later reimbursed him for the purchase).  Opp'n at 5 n.2.

button. *Id*. ¶ 8. Immediately above the yellow button, the following text appears: "By placing your order, you agree to Best Buy's Terms & Privacy Policy." *Id*. ¶ 7 (quoting Best Buy Checkout Page). Although this text is primarily light grey, "Terms" is blue and hyperlinks to the full text of the Best Buy Terms. *Id*.

The user thus would be presented with the following at the moment of purchase:

By placing your order, you agree to Best Buy's **Terms & Privacy Policy.**

**Place your order**

The Best Buy Terms then in effect state that use of "the mobile Best Buy site" to "purchase [p]roducts" confers the user's consent to its "terms and conditions." Best Buy Terms at 2. The Terms attach whether a user "create[s] an account, make[s] a purchase as a guest, or log[s] in to any Best Buy [mobile application]." *Id*.

Important here, the Best Buy Terms contain a binding arbitration provision. It provided that—with limited exceptions not relevant here[4]—any dispute involving a user and Best Buy must be resolved through individual arbitration. The Terms so state in all capital letters. They add that the word "disputes" is to be interpreted "broadly" and "cover any claim or controversy arising out of or relating in any way whatsoever to [a user's] relationship or interaction with Best Buy" or its affiliates. The Terms add that claims fall under the purview of the agreement

> whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory. . . . Examples of relationships or interactions giving rise to a covered claim include, without limitation. . . your purchase of products or services offered, sold, or distributed by Best Buy including, but not limited to, any [d]ispute arising from the advertising of, or sales practices related to, such products and services. If you

---

[4] These were for where a claim (1) falls within the jurisdiction of small claims court or (2) seeks to enjoin infringement of intellectual property rights. Best Buy Terms at 7.

4

are a My Best Buy ® member, [d]ispute shall also include all disputes that arose before your enrollment in, and after the cancellation or termination of, the My Best Buy ® program, including any claims that are the subject of a purported class action litigation.

*Id.* at 7.

### 3.    Macioce's Membership in a Best Buy Loyalty Program

Separately, Hisense represents—again without refutation—that, as of the date of his purchase, Macioce was a member of Best Buy's loyalty program, entitled "My Best Buy."  A declaration from Best Buy's associate director of membership engagement states that, on February 23, 2018, Macioce had created a Best Buy account and enrolled in that program.  Dkt. 48 ("Poplau Decl.") ¶ 6.

Salient here, on October 20, 2019, Best Buy notified all loyalty account holders that the terms of its program had changed.  *Id.* ¶¶ 8–10.  The email included as a "Key update[]" that as of October 19, 2019, Best Buy "ha[d] renewed the dispute resolution provisions of the My Best Buy ® terms, including the sections pertaining to [its] binding arbitration agreement."  Dkt. 48-4 ("October 20 Best Buy Email").  These terms contained an arbitration clause identical to the one in the Best Buy Terms.  *Compare* Best Buy Terms at 4–5, *with* Dkt. 48-6 ("Loyalty Terms") at 7–10.[5]  As such, the Loyalty Terms required that any dispute involving a loyalty account holder

---

[5]  The Loyalty Terms state:

> ANY DISPUTE INVOLVING YOU AND BEST BUY OR ANY OF ITS AGENTS MUST BE RESOLVED THROUGH INDIVIDUAL ARBITRATION . . . .  "Dispute" shall be interpreted broadly and cover any claim or controversy arising out of or relating in any way whatsoever to your relationship or interaction with Best Buy, its agents, and its present and future subsidiaries, affiliates, and designees. . . whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory. . . .  Examples of relationships or interactions giving rise to a covered claim include, without limitation. . . .your purchase of products or services offered, sold, or distributed by Best Buy including, but not limited to, any [d]ispute arising from the advertising of, or sales practices related to, such products

and Best Buy or any of its affiliates must be resolved through arbitration, that any arbitration would proceed on an individual rather than as a class basis, and that "dispute" extended to any claim or controversy based in fraud or misrepresentation arising from the advertising of products sold by Best Buy.  *Id.*

As of November 23, 2024, when Macioce purchased the TV through Best Buy, the terms of Best Buy's loyalty program continued to include the same arbitration provision.  *Id.* at 7; Poplau Decl. ¶ 9.

### 4.    Arrival and Set Up of Macioce's TV

Several days after completing his purchase, Macioce's TV arrived at his home in New York City.  Opp'n at 5. Once it arrived, Macioce's son, Nicholas Macioce, set it up.  Dkt. 43-1 ("Resp. to RFAs").

During the set-up process for a QD5 Hisense TV, a user is presented with "Terms and Conditions."  Dkt. 45 ("Zhang Decl.") ¶¶ 5–6.  The user is given the option to assent to any or all of (1) all terms and conditions; (2) the end user license agreement ("EULA"); and (3) a data protection policy.  Dkt. 49 ("Mot." or "Motion") at 8.  The user is presented with a box, alongside each option, and instructed to check or uncheck to signal his assent.  Zhang Decl. ¶¶ 5–7.  As illustrated below, a button that reads "view details," situated to the right of each item, gives a user the ability to review a complete copy of the terms and conditions, EULA, and data protection policy.  *Id.* ¶¶ 6–7; Dkt. 45-1 ("EULA").

---

and services.  If you are a My Best Buy ® member, [d]ispute shall also include all disputes that arose before your enrollment in, and after the cancellation or termination of, the My Best Buy ® program, including any claims that are the subject of a purported class action litigation.

Loyalty Terms at 7.



Salient here, the EULA stated:

By using the Device . . . you agree to be legally bound and abide by this EULA. Your use of the Device . . . indicates that you have read and accepted this EULA and any other applicable terms.

As to dispute resolution, the EULA included the following provision mandating arbitration:

This Provision provides that all disputes between You and Us shall be resolved by binding arbitration because acceptance of these Terms constitutes a waiver of Your right to litigation claims and all opportunities to be heard by a judge or jury. We prefer this because We believe arbitration is less drama-filled than litigation. To be clear, there is no judge or jury in arbitration, and court review of an arbitration award is limited. The arbitrator must follow these Terms and can award the same damages and relief as a court (including attorney's fees). You may, however, opt-out of this Provision which means You would have a right or opportunity to bring claims in a court, before a judge or jury, and/or to participate in or be represented in a case filed in court by others (including, but not limited to, class actions). EVERYONE AGREES THAT, EXCEPT AS PROVIDED BELOW, ANY AND ALL DISPUTES, AS DEFINED ABOVE, WHETHER PRESENTLY IN EXISTENCE OR BASED ON ACTS OR OMISSIONS IN THE PAST OR IN THE FUTURE, WILL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION RATHER THAN IN COURT IN ACCORDANCE WITH THIS PROVISION.

EULA § 14.

The EULA defines the "disputes" falling within arbitration to include a "claim or controversy, whether based on contract, statute, regulation, ordinance, tort—*including*, *but not limited to, fraud, misrepresentation*, fraudulent inducement, or negligence[] or any other legal or equitable theory." *Id.* (emphasis added).[6]

A user need not accept the EULA to use his Hisense TV. Zhang Decl. ¶ 9. The EULA gives the user the opportunity to opt out of arbitration within 30 days of accepting the EULA by emailing "product.tv.info@gmail.com" and stating that he does not wish to be subject to the arbitration provision. EULA § 14. Hisense does not have any record that Macioce opted out of the EULA arbitration agreement. Zhang Decl. ¶ 15. And Macioce admits that he did not do so. Resp. to RFAs at 4.

Macioce states he did not personally accept the EULA during the set up process, because his son set up the TV. Dkt. 51-1 ("R. Macioce Decl.") ¶ 8. Macioce's son does not recall either accepting or not accepting the EULA during the set up. Dkt. 51-2 ("N. Macioce Decl.") ¶ 8.

Accepting the EULA is, however, necessary to unlock certain smart features of a user's Hisense TV, such as product improvement features. Zhang Decl. ¶ 9. These features transmit information to and from Hisense servers and a user's TV. *Id*. ¶ 10. By November 27, 2024, Macioce's TV appeared in Hisense's product improvement logs, indicating the EULA had been

---

[6] All three agreements—the Best Buy Terms, Loyalty Terms, and EULA—identify the arbitral forum as the American Arbitration Association. *See* Loyalty Terms at 8–10; Best Buy Terms at 5–6; EULA at 11–12. The EULA states that the arbitration alternatively can be held before Judicial Arbitration and Mediation Services ("JAMS"). *Id*. at 11.

The agreements otherwise differ in two respects. The EULA arbitration provision does not list examples of "covered relationships." *Compare id*. at 10–12, *with* Best Buy Terms at 7–10. And its choice of law provision selects the forum of the user (here, New York), whereas the Best Buy Terms and Loyalty Terms are governed by the law of Minnesota. *Compare* EULA at 12–13, *with* Best Buy Terms at 8–9.

"checked" (*i.e.*, accepted) on the TV. *Id.* ¶ 12; Dkt. 45-2 ("Product Improvement Logs"). Had Macioce had not accepted the EULA, the TV would have been unable to access this "smart" feature. Zhang Decl. ¶¶ 11–12. Hisense's examination of Macioce's TV reflects that as of July 25, 2025 the EULA box was still accepted. *Id.* ¶ 13; Photograph of Macioce TV.[7]

### 5.    Macioce's Decision to Bring This Lawsuit

Macioce later concluded, based on reports from third parties including the electronics reviewer Rtings.com, that the Hisense model he had purchased, which had been held out as using QLED technology, in fact did not do so. AC ¶¶ 36–39. These reports unfavorably contrasted the spectral distribution of Hisense "QLED" TVs with that of competing TVs and identified other alleged deficiencies in Hisense's TV. *Id.* ¶¶ 40–41. These reports, Macioce states, prompted him to bring this putative class action. *Id.* ¶¶ 4–7.

### C.    Procedural History

On February 25, 2025, Macioce filed his initial Complaint. Dkt. 1. It alleged that he "paid more for his Hisense television than he otherwise would have" had the TV "not been advertised as containing QLED or QD technology." *Id.* ¶ 55. On behalf of a putative class of purchasers of certain Hisense models during a period comprised of timely claims, the Complaint brought claims under the NYGBL, alleging deceptive marketing practices and false advertising. *Id.* ¶¶ 57–61. It alleged that Hisense had made "misleading and untrue statements about the QLED technology of its televisions" which "are likely to deceive consumers and . . . influence their decisions on whether to purchase a Hisense television" at higher prices, *id.* ¶ 46, and similar misrepresentations to retailers to increase offerings of its products in stores and online, *id.* ¶ 47.

---

[7] On July 25, 2025, as part of arbitration-related discovery, Hisense physically inspected the TV in the presence of Macioce and his counsel. Zhang Decl. ¶¶ 10–11. Hisense identified the unique device ID associated with the TV, *id.*, and determined that the EULA-related box was still checked on the TV. Photograph of Macioce TV.

On May 30, 2025, Hisense moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkts. 23–24. On June 13, 2025, the parties submitted a joint letter, in which they urged a stay of briefing on that motion, in light of Hisense's anticipated motion to compel arbitration, as to which the parties asked the Court to authorize the taking of limited discovery. Dkt. 30 at 2–3. On June 20, 2025, Macioce filed the AC, the operative complaint today. Dkt. 34. It added allegations about third-party reviews of Hisense TVs, which contained claims of deficiencies in the QLED technology. *Id.* ¶¶ 35–44.

On June 24, 2025, the Court ordered the parties to conduct arbitration-related discovery, and suspended motion-to-dismiss briefing pending resolution of the arbitration motion. Dkt. 36.[8] On July 1, 2025, the Court set a briefing schedule for that motion. Dkt. 38.

On August 15, 2025, Hisense moved to compel arbitration. *See* Motion. In support, it submitted Macioce's responses to requests for admission, Resp. to RFAs, and declarations from Hisense and Best Buy employees. Dkts. 43–48. On August 29, 2025, Macioce filed his opposition, including declarations from himself and his son. Dkt. 51.[9] On September 5, 2025, Hisense replied. Dkt. 55 ("Reply").

## II. Applicable Legal Standards

The Federal Arbitration Act ("FAA") provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "creates a body of federal substantive law

---

[8] On August 18, 2025, the Court denied Hisense's motion to dismiss, Dkt. 23, without prejudice to later renewal, Dkt. 50.

[9] On September 3, 2025, Macioce moved to file a second amended complaint, seeking to add as plaintiffs his son, Nicholas, due to his role in setting up Macioce's TV, and other persons who had "reached out regarding the lawsuit." Dkt. 53 at 2. On September 4, 2025, the Court denied Macioce's request, based on its untimeliness and potential prejudice to Hisense. Dkt. 54.

establishing and regulating the duty to honor an agreement to arbitrate." *Mitsubishi Motor Corp., v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).  Congress enacted the FAA to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements upon the same footing as other contracts." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11 (1974) (cleaned up).

"The question whether the parties have submitted a particular dispute to arbitration, [*i.e.*] the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation omitted).  There are two questions for courts to consider in ruling on a motion to compel arbitration: (1) whether there is a valid arbitration agreement, and if so, (2) whether the subject of the dispute is within the scope of the arbitration agreement, *Nat'l Union Fire Ins. Co. of Pittsburgh v. Belco Petroleum Corp.*, 88 F.3d 129, 135 (2d Cir. 1996); *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022).

In evaluating a motion to compel arbitration, "courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) ("*Nicosia I*") (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)).  Courts "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and "draw all reasonable inferences in favor of the non-moving party." *Id.* "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, N.A. v. VCG Special*

*Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171–72 (2d Cir. 2011) (citation omitted); *see Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 49–50 (2d Cir. 2022).

The party moving to compel arbitration "must make a *prima facie* initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Mines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order). The moving party need not "show initially that the agreement would be *enforceable*, merely that one existed." *Id.* (emphasis in original). Thereafter, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir, 2010) (citing *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000)).

## III.    Discussion

The Court considers whether the parties entered into an agreement or agreements to arbitrate and whether such encompass the claims Macioce brings here. *See Zachman*, 49 F.4th at 102. Hisense identifies three agreements with arbitration provisions that, it contends, require Macioce to arbitrate his claims: (1) the Loyalty Terms with Best Buy, (2) the Best Buy Terms, and (3) the EULA. Hisense is correct as to each.

### A.    The Loyalty Terms with Best Buy

It is undisputed that Macioce is a Best Buy loyalty account holder and that creating such an account required him to accept the Loyalty Terms, which include an arbitration provision. Hisense thus argues that under the Loyalty Terms, Macoice agreed to arbitrate. Mot. at 10–11. Macioce does not dispute that he maintains a Best Buy loyalty account. Instead, in opposing the motion to compel arbitration, he states that he had "no reason . . . to believe" that by signing up for a Best Buy loyalty account, "he was also agreeing to arbitrate unrelated claims against a third party." Opp'n at 22. He also argues that his agreement with Best Buy is not triggered here

because Hisense is a "complete stranger" to it and that none of his claims against Hisense implicate the Loyalty Terms.  *Id*. (quoting *Ross v. Am. Exp. Co.*, 547 F.3d 137, 142–48 (2d Cir. 2008)).

The Loyalty Terms' arbitration clause unambiguously covers the instant dispute.  It is undisputed that, since February 23, 2018, Macioce has maintained a Best Buy loyalty account, and that, by October 20, 2019, such account holders had been alerted to the Loyalty Terms in emails that Best Buy sent to them, which highlighted the arbitration provision.  Mot. at 10–11; October 20 Best Buy Email.  The Loyalty Terms effective as of November 23, 2024, when Macioce purchased the TV, broadly committed him to arbitrate any dispute arising out of his dealings with Best Buy:

> Any dispute involving you and Best Buy or any of its agents must be resolved through individual arbitration. . . . *"Dispute" shall be interpreted broadly and cover any claim or controversy arising out of or relating in any way whatsoever to your relationship or interaction with Best Buy, its agents, and its present and future subsidiaries*. . . whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory.

Loyalty Terms at 7 (cleaned up) (emphasis added).

The Loyalty Terms specifically list, among the "relationships or interactions" covered by the arbitration clause, "your purchase of products or services offered, sold, or distributed by Best Buy including. . . any [d]ispute arising from the advertising of, or the sales practices related to, such products and services."  *Id*.  These terms encompass Macioce's claims against Hisense. These arise from his purchase of a "product" (the TV) "sold" and "distributed" by Best Buy.  AC ¶¶ 128–141.  And Macioce's NYGBL claims of deceptive marketing practices and false advertising qualify as claims "based in . . . statute, fraud, misrepresentation or any other legal theory," not to mention ones "arising from the advertising, or the sales practices related to" the product.  Loyalty Terms at 7.

Macioce's claim that did he not appreciate that he could be forced to arbitrate claims against the manufacturer of a good sold by Best Buy is beside the point. *See* Opp'n at 22. The text of the Loyalty Terms, not his subjective state of mind, governs. These terms squarely placed Macioce on notice that *any dispute* "arising from the advertising of" products sold by Best Buy, which necessarily included the Hisense TV that Macioce bought at Best Buy, would be subject to arbitration. Loyalty Terms at 7.

Nor can Macioce claim a lack of notice of the arbitration provision. Where electronic notice is at issue, a court examines the design and content of the interface to assess whether the arbitration terms were presented to the consumer in a manner that put him on notice. *Nicosia I*, 834 F.3d at 233–38. Here, the Loyalty Terms take the form of a "clickwrap" or "scrollwrap" agreement, which required the user to click "I agree" or similar language in order to proceed with creating an account. The Second Circuit has consistently upheld such agreements where a user has "affirmatively assented to the terms of the agreement." *Zachman*, 49 F.4th at 103. And Best Buy had separately emailed loyalty account holders, including Macioce, highlighting in a bullet point (alongside only two other points) the arbitration requirement. *See* October 20 Best Buy Email.

This case is thus far afield from those in which the Second Circuit has held that a consumer was given inadequate notice of an inconspicuous arbitration provision. *See, e.g.*, *Starke v. SquareTrade, Inc.*, 913 F,3d 279, 288–95 (2d Cir. 2019) (user not compelled to arbitrate where "the terms of the contract were obscured and minimized," by being placed in small font at the end of an email, alongside numerous terms and conditions); *Nicosia I*, 834 F.3d at 235–38 (user not compelled to arbitrate where "place your order" button was too far from Amazon's terms and conditions to provide notice of arbitration). It instead aligns with the many

14

cases compelling arbitration where the customer was given fair notice of the provision. *See, e.g.*, *Meyer v. Uber Tech, Inc.*, 868 F.3d 66, 79–80 (2d Cir. 2017) (consumer unambiguously assented to arbitration when creating user account for Uber mobile application); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 121 (2d Cir. 2012) (transmission of terms by email after initial enrollment sufficient to place plaintiff on inquiry notice of arbitration provision); *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 116 (2d Cir. 2025) (notice supplied temporally close to when user completed enrollment sufficient to compel arbitration with Grubhub); *Olsen v. Charter Commc'ns, Inc.*, No. 18 Civ. 3388, 2019 WL 3779190, at *6 (S.D.N.Y. Aug. 9, 2019) (where arbitration provision used capital letters, unlike other provisions in an agreement, user was found to have sufficient notice).

Also off-base is Macioce's claim that Hisense, as a non-signatory, cannot invoke the arbitration clause of the Loyalty Terms. "The Supreme Court has instructed that state law governs whether a non-signatory may enforce an arbitration clause." *Doe v. Trump Corp.*, 6 F.4th 400, 412 n.8 (2d Cir. 2021) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009)). The Loyalty Terms provide that Minnesota law governs. Loyalty Terms at 10. Under Minnesota law, a non-signatory can be bound to arbitration agreements signed by another under a theory of equitable estoppel. *Onvoy, Inc. v. SHAL, LLC*, 669 N.W.2d 344, 356 (Minn. 2003). The Second Circuit has developed, as a matter of federal common law, a test for equitable estoppel consistent with Minnesota law. It inquires whether the signatory's claims are intertwined with the underlying contract obligations. *Dominium Austin Partners, LLC v. Lindquist*, 2001 WL 950085, at *8 (Minn. Ct. App. Aug. 21, 2001) (citing *Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 527 (5th Cir. 2000)); *Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 404 (2d Cir. 2001); *F. Hoffmann-La Roche Ltd. v. Qiagen*

15

*Gaithersburg, Inc.*, 730 F. Supp. 2d 318, 329.  Although there is no "minimum quantum of 'intertwined-ness'" to support estoppel, the Second Circuit applies a two-part test, in which it evaluates whether "(1) the signatory's claims arise under the 'subject matter' of the underlying agreement, and (2) there is a 'close relationship' between the signatory and the non-signatory party."  *Ross*, 547 F.3d at144; *Ragone v. Atl. Video at Manhattan Ctr.*, No. 7 Civ 6084, 2008 WL 4058480, at *8 (S.D.N.Y. Aug. 29, 2008) *aff'd*, 595 F.3d 115 (2d Cir. 2010); *In re Currency Conversion Fee Antitrust Litig,* 265 F.Supp.2d 385, 401–02 (S.D.N.Y. 2003); *Chase Mortg. Company–West v. Bankers Trust Co.,* No. 00 Civ. 8150, 2001 WL 547224, at *2–3 (S.D.N.Y. May 23, 2001).

Both parts of the test are satisfied.  As to the subject matter, a court is directed to consider the scope and focus of the parties' underlying agreement.  In *Ragone,* for example, Judge Koeltl found that a plaintiff's workplace harassment claims were subject to an arbitration agreement where it covered "*any* and *all* claims or controversies arising out of the employee's employment."  *Ragone*, 2008 WL 4058480, at *8 (emphasis added); *see also Lismore v. Societe Generale Energy Corp.*, No. 11 Civ. 6705, 2012 WL 3577833, at *7 (S.D.N.Y. Aug. 17, 2012) (arbitration agreement applying to "all disputes arising out of or relating to this Agreement" estopped plaintiff from evading arbitration with non-signatory).  Likewise, in *Ross*, the Second Circuit observed that it was "indisputable" that the subject matter of the parties' dispute was "related to the subject matter" of the agreements.  *Ross*, 547 F.3d at 146.

Here, the Loyalty Terms are drawn in extremely broad terms, to cover "any claim or controversy arising out of or relating in any way whatsoever to [a buyer's] relationship or interaction with Best Buy."  Loyalty Terms at 7.  And the subject matter covers, as noted, claims sounding in fraud and claims "arising from the advertising of, or the sales practices related to,

such [p]roducts."  *Id*.  This broad text put Macioce squarely on notice that a claim arising from the marketing of the TV he bought from Best Buy would be subject to arbitration, even if brought against the manufacturer of the TV.

As to the second prong of the equitable estoppel test, it assesses whether there exists a sufficiently "close relationship" between the signatory and the non-signatory who seeks to compel arbitration.  *Lismore*, 2012 WL 3577833, at *7–8.  In *Denney v. BDO Seidman, L.L.P.*, for example, the Second Circuit held that where a non-signatory had "acted in concert [with a signatory] to defraud plaintiff[]" and where the alleged fraud "arose in connection with" the signatory's actions, the plaintiff was estopped from avoiding arbitration.  412 F.3d 58, 70 (2d Cir. 2005); *see also Ragone*, 2008 WL 4058480, at *8 (finding such relationship where pleadings suggested a close relationship between signatory and non-signatory movant); *Schreiber v. Friedman*, No. 15 Civ. 6861, 2017 WL 5564114, at *17 (E.D.N.Y. Mar. 31, 2017) (finding close relationship where intervention of non-signatory defendant was "inevitable or predictable" (citation omitted)).  The Second Circuit has routinely found this requirement met in cases involving corporate affiliates, subsidiaries, agents, or "other related business entities," and in "a limited number of [other] circumstances," such as when "the signatory seeking to avoid arbitration treated the other signatory and nonsignatory as interchangeable with respect to its rights and responsibilities under the relevant contract."  *Trump Corp.*, 6 F.4th at 413 (cleaned up).  Salient here, a "manufacturer" and "retailer" have generally been found to have a close business relationship with respect to the product at issue, permitting a non-signatory to avail itself of an arbitration agreement.  *Shepherd v. Belkin Int'l, Inc.*, 683 F. Supp. 3d 282, 288 (E.D.N.Y. 2023); *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 178 (2d Cir. 2004) (finding such a relationship where parties had "close corporate and operational relationship"); *Thomson–*

*CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 779 (2d Cir. 1995) (collecting cases where signatories were bound to arbitrate "because of the close relationship between the entities involved" (citation omitted)).[10]

On the facts pled, notwithstanding that Hisense and Best Buy were not part of the same corporate family, there was a close relationship between the two with respect to the purchase at issue: a manufacturer-retailer relationship.  AC ¶¶ 14, 45, 48, 60.  It was fundamental to Hisense's business operations: if "Hisense's retailers did not adequately display or offer for sale Hisense's televisions, then Hisense's net sales would have decreased, and its business would have been harmed."  *Id.* ¶ 58.  This relationship is foundational to Macioce's claims in two respects.  First, the AC alleges that Hisense "developed and controlled" the allegedly false advertising that it displayed on Best Buy's website, whose "representations precisely repeat the claims on Hisense's website," and inspired Macioce to purchase his TV.  *Id.* ¶¶ 61–62.  Second, it alleges that Hisense's misleading and untrue statements spurred retailers to increase offerings of its TVs in stores and online, thereby further misleading consumers.  *Id*. ¶ 58.  The AC's claims, therefore, centrally allege that Hisense's alleged fraudulent acts were "in concert" with its retailer, Best Buy.  *Denney*, 412 F.3d at 70.  And, as the case law reflects, broad language such as in the Loyalty Terms here can bind a signatory to arbitrate claims against third parties who are not formal corporate affiliates.  *See, e.g., Shepherd*, 683 F. Supp. 3d at 288–89; *Clarke*

---

[10] *Ross*, on which Macioce relies, is not to the contrary.  In that case, the Second Circuit noted, there was neither a "corporate affiliation" or a close relationship—formal or informal—between the consumer-plaintiff and the non-signatory to the arbitration agreement. *v. Am. Exp. Co*., 547 F.3d 137, 146 (2d Cir. 2008).  One non-signatory was a competitor to the credit-card issuing banks with whom the plaintiff had entered into the arbitration agreement.  *Id.* at 145–46 ("In sum, arbitration is a matter of contract and, contractually speaking, the plaintiffs do not know Amex from Adam.  Amex therefore cannot avail itself of the arbitration agreements contained in the cardholder agreements.").  That is not the case here, as Macioce, grudgingly, concedes. *See* Opp'n at 25 ("Hisense and Best Buy may enjoy some corporate 'relationship'").

*v. Alltran Financial, LP*, 2018 WL 1036951 (E.D.N.Y. Feb. 22, 2018); *cf. Madorskaya v. Frontline Asset Strategies, LLC*, 2021 WL 3884177, at *8 (E.D.N.Y. Aug. 31, 2021) (finding debt collector insufficiently connected to compel arbitration with bank).

The Court accordingly holds that Macioce is bound to arbitrate his claim here by virtue of the arbitration agreement in the Loyalty Terms.[11]

### B.    Best Buy's Terms and Conditions

It is undisputed that Macioce purchased the TV through Best Buy.  AC ¶ 60; Mot. at 7. And the terms and conditions to which Macioce consented while completing that purchase contained an arbitration clause identical to the one in the Loyalty Terms.  *Compare* Best Buy Terms at 4–5, *with* Loyalty Terms at 7–8.  The Best Buy Terms also cross-reference the Loyalty Terms.  Best Buy Terms at 2.

In these circumstances, Macioce is equally bound to arbitrate his claims by dint of the arbitration clause he assented to in using the Best Buy website.  Macioce's claim that he did not assent to these terms is unconvincing.  As reviewed above, the Best Buy Terms appeared via a link immediately above the yellow button that Macioce was required to click to place his order. That placement was amply prominent to give Macioce reasonable notice of the existence of the Best Buy Terms.  *See, e.g.*, *Nicosia I*, 834 F.3d at 227–34 (consumer had constructive notice of arbitration provision where, before completing his purchase, he was presented with a link to the terms and conditions, in contrast to cases where terms were "linked in an obscure section[] of a

---

[11] Hisense separately notes that the Loyalty Terms—and an email from Best Buy highlighting these terms—bar the signatory from bringing class claims.  Loyalty Terms at 9.  Insofar as Macioce's individual claims are covered by a binding arbitration agreement, any bid by Hisense to enforce the class action waiver in that agreement is properly directed to the arbitrator, not this Court.  *See, e.g.*, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010); *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 124 (2d Cir. 2011).

webpage that [a] user[] [is] unlikely to see," *id.* at 233); *Starkey v. G Adventures, Inc.*, 796 F.3d

193, 197 (2d Cir. 2015) (email with language advising user to click on link to Terms and

Conditions provided clear prompt to review arbitration provision); *Fteja v. Facebook, Inc.*, 841

F. Supp. 2d 829, 838–41 (S.D.N.Y. 2012) (enforcing forum selection clause where terms and

conditions where reasonably communicated to social media user via visible hyperlink); *cf. In re*

*Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012)

("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com

webpage among many other links, and the website never directs a user to the Terms of Use.").[12]

And, "[a]s with paper contracts or shrinkwrap agreements, to be bound, an internet user need not

actually read the terms and conditions or click on a hyperlink that makes them available as long

as she has notice of their existence." *Nicosia I*, 834 F.3d at 232.

Macioce is therefore separately obliged to arbitrate his claims against Hisense based on

the Best Buy Terms.

### C.     The End User License Agreement

The parties disagree whether Macioce is bound by the EULA.  The facts leave no doubt

that someone in Macioce's household, in setting up the TV's smart services, assented to the

EULA, which contains an arbitration provision.  Macioce represents that his son, not he, set up

the TV, and that neither of them recalls reviewing the EULA during the set-up or appreciating

---

[12] The cases in which courts have refused to enforce arbitration agreements where links to the operative terms and conditions were obscurely situated are thus easily distinguished.  *See, e.g., Hines v. Overstock.com, Inc.*, 668 F.Supp.2d 362, 367 (E.D.N.Y. 2009) (finding no notice where link to terms and conditions were not prominently displayed); *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 292 (2d Cir. 2019) (finding interface cluttered with multiple colors, sizes and fonts, distracted user from hyperlink with relevant terms and conditions); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 31–32 (2d Cir. 2002) (finding insufficient notice of contract terms were available via hyperlink at very bottom of a webpage that distracted viewer with unrelated praise for product).

that activating the TV's smart services would subject them to the EULA.  R. Macioce Decl. ¶ 8;

N. Macioce Decl. ¶¶ 7–8.  Hisense counters that Macione's son was acting as his agent in setting

up the Hisense TV, and that Macioce cannot shirk the EULA by noting he did not personally set

it up.  Mot. at 15–17.  And, it notes, the EULA provides a clear opt-out mechanism, which

neither Macioce nor his son utilized.  *Id*. at 10.

Hisense is correct.  The EULA's arbitration provision substantially mirrored the terms of

the Best Buy Terms, with limited exceptions.  Like the Loyalty Terms and Best Buy Terms, the

EULA covered disputes with "the broadest meaning enforceable by law."  EULA § 14.  And like

the Loyalty Terms and Best Buy Terms, the EULA alerted users in capital letters to the binding

arbitration requirement: "any and all disputes . . . whether presently in existence or based on acts

or omissions in the past or in the future, will be resolved exclusively and finally by binding

arbitration."  *Id*.  Macioce's argument that his claims against Hisense arise from its earlier

advertising rather than his current usage of the TV therefore does not gain traction, as the

arbitration provision reaches past "acts or omissions."  *See* Opp'n at 11.  And Macioce's

argument that the two Best Buy arbitration provisions do not apply based on the absence of a

formal corporate relationship between Best Buy and Hisense cannot be levied as to the EULA.

The EULA expressly covers disputes between "the end user" and "Hisense," and requires such

disputes to be resolved through arbitration.  EULA at 1, § 14.

The Court accepts *arguendo* Macioce's factual account that he delegated the set-up of the

TV to his son and did not participate in the set-up process, as he and his son attest, R. Macioce

Decl. ¶ 8; N. Macioce Decl. ¶ 7, and that he bought the TV with his son as a gift for himself, R.

Macioce Decl. ¶ 2.  Those details are irrelevant.  On any version of the facts, Macioce implicitly

authorized his son to set up the TV he had purchased.  As such, under principal-agent law,

Macioce is bound by the EULA to which his son assented during the set-up process.  *See Nicosia v. Amazon.com, Inc.*, 815 F. App'x 612, 614 (2d Cir. 2020) (summary order) ("*Nicosia II*").

Where a principal authorizes an agent to perform a task, the principal is bound by the terms and conditions accepted by their agent.  *See In re Payroll Express Corp.,* 186 F.3d 196, 207 (2d Cir. 1999).  "Under traditional principles of agency law, one who has not personally signed a contract will nonetheless be bound by it if he . . . has signed it through an authorized agent."  *In re Arb. Between Nat. Union Fire Ins. Co. of Pittsburgh, P.A. v. Pers. Plus, Inc*., 954 F. Supp. 2d 239, 245 (S.D.N.Y. 2013) (cleaned up).

As the Second Circuit's order in *Nicosia II* underscores, those principles apply in the context of an arbitration agreement entered into by an agent.  At issue there was an arbitration agreement assented to by the plaintiff's friend, who had logged into plaintiff's Amazon account and signed her up for an "Amazon Mom" account.  *Nicosia v. Amazon*, 384 F. Supp. 3d 254, 260 (E.D.N.Y. June 14, 2019), *aff'd*, *Nicosia II*.  The Circuit held that, although the plaintiff had not physically inputted her payment or billing information or clicked the button reading "Sign up for Amazon Mom," her friend's actions nonetheless bound her to arbitrate her claims.  *Id*. at 260–61; *In re Arb. Between Nat. Union Fire Ins. Co. of Pittsburgh*, 954 F. Supp. 2d at 245 (agent with actual and apparent authority to enter into agreements bound principal to arbitration agreement); *Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd*., 902 F. Supp. 2d 87, 101 (D.D.C. 2012) (principal who manifested assent for agent to act on her behalf was bound by arbitration agreement); *cf. Kwatinetz v. Mason,* 356 F. Supp. 3d 343, 349 (S.D.N.Y. 2018) (holding non-signatory not bound by arbitration agreement where agent clearly signed on behalf of certain disclosed principal).

Macioce is therefore also obliged to arbitrate his claims against Hisense based on the arbitration clause in the EULA.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to compel arbitration. Accordingly, the Court stays this action in its entirety. *See Katz v. Cellco P'ship*, 794 F.3d 341, 346–47 (2d Cir. 2015). The Court respectfully directs the Clerk of Court to terminate the motion pending at docket 42 and to stay this case. The parties are directed to file a joint status update on the docket every 60 days as to the status of the arbitration proceeding.


SO ORDERED.

*Paul A. Engelmay*

PAUL A. ENGELMAYER
United States District Judge

Dated: December 19, 2025
      New York, New York

23